**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| 1) **MASON MECKLENBURG,** | § | |
| | § | |
| **Plaintiff,** | § | |
| v. | § | **Case No. CIV-22-089-G** |
| | § | |
| 1) **KINGFISHER INDEPENDENT** | § | |
| **SCHOOL DISTRICT NO. 7 OF** | § | |
| **KINGFISHER COUNTY,** | § | **Jury Trial Demanded** |
| **OKLAHOMA, a/k/a KINGFISHER** | § | |
| **SCHOOL DISTRICT, a/k/a** | § | |
| **KINGFISHER PUBLIC SCHOOLS;** | § | |
| | § | |
| | § | |
| 2) **JEFF MYERS, individually;** | § | |
| | § | |
| 3) **MICAH NALL, individually;** | § | |
| | § | |
| 4) **DEREK PATTERSON, individually;** | § | |
| **and,** | § | |
| 5) | § | |
| **BLAKE EATON, individually,** | § | |
| | § | |
| **Defendants.** | § | |

**<u>PLAINTIFF'S SECOND AMENDED COMPLAINT</u>**

COMES NOW the Plaintiff, Mason Mecklenburg ("Mason") and files this Second Amended Complaint for his causes of action against Defendants Kingfisher Independent School District No. 7 of Kingfisher County, Oklahoma, a/k/a Kingfisher School District, a/k/a Kingfisher Public Schools ("Kingfisher Public Schools"); Jeff Myers, individually ("Myers"); Micah Nall, individually ("Nall"); Derek Patterson, individually ("Patterson"); and Blake Eaton individually ("Eaton"), alleges and states as follows:

## PART ONE – THE PARTIES

1.     At all relevant times pertinent hereto, Plaintiff, Mason, was a citizen of the State of Oklahoma and a resident of Kingfisher County, Oklahoma.  Plaintiff attended Kingfisher High School his freshman, sophomore, junior and senior years. Plaintiff was a member of the Kingfisher High School football program each of these four years and endured bullying, physical assault and battery, and torture during these four years.  Plaintiff graduated from Kingfisher High School in 2021.

2.     Defendant Kingfisher Public Schools is a public educational institution located in Kingfisher County, Oklahoma. The School District is an Oklahoma school district organized and existing under the laws of the State of Oklahoma and has its principal office in Kingfisher County, Oklahoma with its principal place of business in this judicial district.  Kingfisher Public Schools receives federal funding and is subject to Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 - 1688.

3.     Defendant Myers is the head coach of the Kingfisher High School football team (the "Football Team").  Myers has just completed his twentieth season as the head coach of the Football Team.  Myers is the shot-caller among all past and present Kingfisher assistant football coaches working under him. Myers is sued in his individual capacity only. At all relevant times pertinent hereto, Myers was a citizen of the State of Oklahoma and a resident of Kingfisher County, Oklahoma. Myers may be served at his place of residence or at any other place he may be properly served.

4.     Defendant Nall was an assistant coach of the Football Team during a relevant time that Mason was a member of the Football Team.  Nall is sued in his individual capacity only.  Nall, is a citizen and resident of the State of Oklahoma.

5.     Defendant Patterson is an assistant coach of the Football Team and was an assistant coach during the relevant time that Mason was a member of the Football Team.  Patterson is sued in his individual capacity only.  At all relevant times hereto, Patterson was a citizen of the State of Oklahoma and a resident of Kingfisher County, Oklahoma.

6.     Defendant Eaton was an assistant coach of the Football Team during a relevant time that Mason was a member of the Football Team.  Eaton is sued in his individual capacity only.  Eaton is a citizen and resident of the State of Oklahoma.

## PART TWO - JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331, which gives district courts jurisdiction over all civil actions arising under the Constitution, laws, and treaties of the United States.

8.     This Court also has subject matter jurisdiction under 28 U.S.C. § 1343, which gives district courts original jurisdiction over any civil action authorized by law to be brought by any person to redress the deprivation, under color of any State Law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; and any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights.

9.     Pursuant to 28 U.S.C. § 1367, this Court also has subject matter jurisdiction over pendent state law claims regarding the violation of the Oklahoma Constitution, state statutes, and common law torts.

10.    Venue is proper in this district, as the Defendants do business in this district, the events giving rise to the claims occurred (at least in part) in this district, and the Defendants reside and/or have their principle place of business in this district.

### PART THREE - FACTUAL BACKGROUND

11.    Plaintiff Mason Mecklenburg began practicing with the Football Team as a fourteen-year-old child and was a member of the Football Team from the fall of 2017 until the fall of 2020.

12.    Defendant Kingfisher Public Schools employed Defendant Myers as the head coach of the Football Team during all relevant times that Mason was a member of said Football Team.

13.    Defendant Kingfisher Public Schools employed Defendant Nall as an assistant coach of the Football Team during the relevant time that Mason was a member of said Football Team. Defendant Nall was suspended from coaching duties during the 2020-2021 school year while child abuse allegations against him were being investigated.

14.    Defendant Kingfisher Public Schools employed Defendant Patterson as an assistant coach of the Football Team during all relevant times that Mason was a member of said Football Team.

15.    Defendant Kingfisher Public Schools employed Defendant Eaton as an assistant coach of the Football Team during the 2017-2018 and 2018-2019 school years

4

while Mason was a member of said Football Team. (Defendants Myers, Nall, Patterson, and Eaton are collectively referred to herein as "Defendant Coaches.")

16.     During all relevant times hereto, Defendant Kingfisher Public Schools issued a Handbook (the "Handbook"), which includes a No Tolerance Policy, a Bullying Policy, a Hazing Policy, and a Sexual Harassment Policy. The Handbook does not include a Title IX Policy.

17.     The Handbook's No Tolerance Policy provides in pertinent part that "[w]eapons of any kind" and "[b]ullying or [h]arassment" will not be tolerated. The No Tolerance Policy provides that its intent "is to help protect all students from dangerous and destructive activities."

18.     The Handbook's bullying policy provides in part:

> It is the policy of this school district that bullying of students by other students, personnel, or the public will not be tolerated. . . . This policy is in effect while the students are on school grounds, in school vehicles, . . . at school-sponsored activities . . . . Bullying of students by electronic communication is prohibited whether or not such communication originated at school or with school equipment, if the communication is specifically directed at students or school personnel and concerns harassment, intimidation, or bullying at school.
> . . . .
> Harassment set forth above may include, but is not limited to, the following:
>
> 1. Verbal, physical, or written harassment or abuse
> 2. Repeated remarks of a demeaning nature;
> . . . .
> 5. Unwelcome physical contact.

19.     The Handbook's Hazing Policy provides:

> The Kingfisher Board of Education prohibits hazing activities within any organization or activity within its control and supervision. When

planning activities for initiation or membership into any organization, activity, or school group, the sponsor shall obtain advance approval from the principal. Oklahoma State Law 21-1190 defines hazing as:

1. An activity that recklessly or intentionally affects the mental health or physical health or safety of a student for purposes of initiation or admission into or affiliation with any organization subject to the sanction of the public or private school or of any institution of higher education of this state.

2. "Endanger the physical health" shall include but not limited to brutality of physical nature, such as whipping, beating, branding, forced calisthenics, exposure to the elements, forced consumption of food, alcohol, drugs or any other forced physical activity or safety of the individual.

3. "Endanger the mental health" shall include any activity that would subject the individual to extreme mental stress, such as prolonged sleep deprivation, forced prolonged exclusion from social contact, [or] forced contact that could result in embarrassment.

4. Any student found involved in hazing will forfeit the remainder of the season in which they are involved in hazing activity and any level of behavioral infraction will be applied.

20.     The Handbook's Sexual Harassment Policy provides in pertinent part: "District policy prohibits sexual harassment such as, but not limited to: unwanted sexual advances or threats, unwanted verbal or physical conduct of sexual nature; inappropriate electronic communication, suggestive comments or off color language, humor, drawings, photo[s], etc. . ."

21.     During his tenure as a member of the Football Team, some of Mason Mecklenburg's teammates and the Defendant Coaches perpetrated a pattern of physical, verbal, emotional, digital, and sexual abuse upon Mason and/or allowed the perpetration of such abuse without intervention. (Mason's teammates who perpetrated any such abuses

6

will be referred to herein as the "Offending Players." An allegation as to the "Offending Players" does not necessarily mean that every Offending Player committed said act but means that one or more of the group of all "Offending Players" committed the specific act.)

22.     During his tenure as a member of the Football Team, the Offending Players and Defendant Coaches committed acts of bullying, hazing, and sexual harassment, all as defined in the Handbook, against Mason and/or allowed the perpetration of such acts without intervention.

23.     During football practice, certain upperclassman Offending Players would frequently hit and/or tackle an unsuspecting and defenseless Mason (among other victims) between plays, while he stood on the sidelines, while he jogged between drills, and while he waited in line between drills. This practice of striking an unsuspecting and defenseless player, usually helmet to back or helmet to helmet, was commonly known among players and coaches as "dicking." Sometimes they would strike him so hard, Mason's helmet would fly off.

24.     In addition, upperclassman Offending Players threw footballs at Mason's head, often from behind so Mason could not see it coming, using extreme force for their proximity, striking Mason relentlessly in the head.

25.     During one football practice, Mason Mecklenburg, a running back, asked Defendant Myers if he could run some plays as a wide receiver. Defendant Myers told Mason that he could not, because he could not catch with his injured hand. Mason assured Defendant Myers he could. Moments later, after Mason had been told he could not attempt to catch the football because of his injury and completely unaware of Defendant Myers'

7

intentions, Defendant Myers threw the football with full strength at Mason from about eight feet away, hitting Mason in the testicles and causing him to fall to his knees. Defendant Myers immediately said, "Oh come on, I didn't hit you in the nuts." Mason and several other nearby players replied "yes, you did" or with similar statements to which Defendant Myers responded, "oh well, sorry; I meant to hit you in the chest." It was clear to Mason that Defendant Myers purposely hit him in the groin area as hard as he could with the football.

26.     The Defendant Coaches saw these chronic physical abuses committed upon Mason but never reprimanded the Offending Players, although any physical contact whatsoever against an Offending Player would result in serious repercussions.

27.     The Offending Players verbally abused Mason with incessant name-calling including, but not limited to, "p*ssy," "spoiled rotten rich kid," and "kiss ass loser." Multiple Offending Players also verbally and emotionally abused Mason by telling him to "kill yourself, dude" and similar statements encouraging Mason to commit suicide. When Mason attempted to protest against or complain about the abuses, Defendant Myers told Mason to "shut up."

28.     The Offending Players and Defendants Myers and Patterson stole and/or damaged Mason's personal property.

29.     Upperclassman Offending Players took Mason's cleats and helmets, wetted them with water, and put them in a freezer, forcing Mason to practice in frozen gear. Other players who were subjected to such bullying would have their helmets wetted inside with urine and placed in a freezer only to discover the disgusting offense when the urine melted

down their faces during practice. On another occasion, they wrapped tape around all of Mason's equipment and belongings.

30.     One game day morning, breakfast was provided to the Football Team. The Offending Players threw their breakfast at Mason's vehicle, put syrup on his door handle, and smashed pancakes on his windshield.

31.     During Mason's senior year, he was among the top sellers of "Jacket Cards," which are sold to raise money for the Kingfisher football program. As an incentive to sell more cards, players receive free Jacket Cards for reaching fixed sales goals. In his senior year, Mason's sales entitled to him to six free Jacket Cards. Players were called to the coaches' office, one by one, to collect their rewards. On Mason's turn to collect his six Jacket Cards from Defendant Patterson, Defendant Myers, who was also present, told Mason to go to the locker room to tell the other players to "shut up and quiet down." Mason complied with the command and then came back to retrieve his Jacket Cards. Defendant Patterson told Mason, "We already gave those to you; go find them." Mason replied that he did not receive the Jacket Cards and that Defendant Patterson was about to give him the Jacket Cards when Defendant Myers asked him to leave. Defendants Patterson and Myers again told Mason that he had received the cards and that he needed to go look for them, suggesting "maybe they are in your truck." Mason adamantly denied receiving the cards and, after an approximately fifteen-minute exchange with Mason, Defendant Myers told him they "don't have time for this crap. Now get out of here." Following this encounter, Mason endured ridicule and humiliation from the Defendant Coaches as they would laugh

at him and ask if he'd found the Jacket Cards that he "lost." Mason was never given the Jacket Cards he earned.

32.    Defendant Coaches singled out Mason for "punishment" for being injured when other injured players were allowed to recover from their injuries without repercussions.

33.    At the Kingfisher High School football game versus Bethany during Mason's junior year, Mason was on the sideline with the team. He was medically ineligible to play in the game as he had surgery on his hand earlier that afternoon, but he was on the sidelines to support the team. Defendant Myers forced Mason to be the "tee boy" who runs out on the field and gets the tee after kickoff, points after touchdown, and similar circumstances in which a tee is used. The "tee boy" position is routinely reserved for team managers or young fans (e.g., third graders) who wish to play a role in the game; aside from this one anomaly in which an injured Mason was forced to fill the role, it is never a position assigned to a player on the Football Team. In fact, two other players were injured prior to Mason's injury and neither of them were demoted to tee boy. After Mason inadvertently provided a player with an incorrect tee, Defendant Myers, red-faced and shaking, grabbed Mason by the shirt collar and, with Defendant Myers' nose directly in front of Mason's screamed at and berated him for the error. He then shoved Mason, who was wearing a cast from his surgery earlier in the day, on the sidelines. Defendant Myers forced Mason to hold the tee throughout the rest of the game; he was not allowed to set it down even during halftime. At the halftime break, Defendant Myers, whose team was losing by at least twenty points,

berated and publicly humiliated Mason by blaming Mason for the team's loss of momentum.

34.     During Mason's senior year, Mason, a varsity player, suffered a broken collarbone prior to the start of the season. As a result of the COVID-19 pandemic, there were three buses on which players traveled to away games: one bus for varsity players, one for junior varsity players, and one for freshmen players. The Defendant Coaches prepared and disseminated a seating chart for the location on the bus where each player would sit. For the first away game, Mason was not assigned to a seat. Mason asked Defendant Myers why he was not assigned a seat on the varsity bus to which Defendant Myers replied that Mason would be riding the freshmen bus, because Mason was injured. For the next three or four away games, Mason was forced to ride the freshmen bus, apparently as punishment for being injured and despite requesting a seat on the varsity bus with the rest of the varsity players, injured and uninjured. There were other injured varsity players, but they all were allowed to ride the varsity bus; only Mason was forced to ride the freshmen bus purportedly because he was injured.

35.     From 2017 to 2019, during Mason's freshman and sophomore years, Mason was subjected to *daily* floggings by upperclassman Offending Players. The Offending Players administered these daily floggings using towels that had been partially shredded (cut vertically to produce tail-like pieces of cloth) with portions tied into hard knots and then wetted with water to inflict maximum pain. An exemplar of this implement of physical pain and sexual violence is below.



36.    These floggings were carried out in various locations (and against various individuals) within the locker room, Mason was most frequently attacked while in the locker room shower, naked and defenseless, where he was forced to turn his back to his attackers (to protect his testicles and penis which were their primary targets), and, as a result Mason would be be repeatedly whipped in the back, legs, and buttocks. The attack would sometimes only stop when the victim began to bleed. A photograph of Mason's injuries resulting from one such a brutal attack follows.



37.     Mason's father showed the above photograph of the injuries to Defendant Myers and to the Kingfisher High School superintendent and principal/athletic director and explained how the injuries were inflicted. Yet again, no action was taken to ensure such brutal beatings of underclassman football players ceased and the locker room floggings continued without interruption.

38.     Defendant Coaches forced members of the Football Team to participate in dangerous practice drills on the field and other perilous physical endeavors off the field.

39.     The Oklahoma Drill, also referred to as the Okie Drill, is an exceptionally dangerous practice utilized by Defendant Coaches in which two players stand

approximately seven yards apart. When the coach blows the whistle, the two go head-to-head at full speed.

40.     The Oklahoma Drill was banned by the National Football League out of concern for player safety.

41.     Mason was forced to remain in the Oklahoma Drill repeatedly for up to eight consecutive sessions while the second participant was rotated after each session.

42.     Time and again, Defendant Coaches forced Mason to participate in the Oklahoma Drill against much bigger and stronger upperclassmen.

43.     The Wall Drill is another dangerous practice utilized by Defendant Coaches in which one player with the football stands with his back against the wall of a building. Two other players hit him at full speed and tackle him into the wall. Often the player with the football is punched and/or, after having fallen, is picked back up and again tackled into the static wall.

44.     Mason was forced to participate in the Wall Drill against much bigger and stronger upperclassmen.  Below is a photograph of the infamous "Wall."



45.     The Bull in the Ring Drill is yet another dangerous practice banned by the National Football League but utilized by Defendant Coaches in which one player is selected by a Defendant Coach to be in the middle of the ring. The "ring" is comprised of other football players. The Defendant Coach then calls out the number of one of the players making up the ring. That player must rush the player in the ring and hit him at full force. Then the Defendant Coach calls out the number of another player who enters the ring, and so on, until the Defendant Coach determines the player in the middle of the ring has had enough abuse.

46.     Defendant Nall ultimately resigned from Kingfisher Public Schools amid allegations related to a child who was injured after Defendant Nall allegedly forced him to

stay in the middle of the ring while he was continually attacked by other players. The incident led to a police investigation.

47.     Another dangerous "exercise" utilized by Defendant Coaches was known as "In the Ring."  "In the Ring" simply put, is nothing more than coach-sanctioned locker room fighting. Generally, players do not have on their football safety equipment during "In the Ring," although sometimes they were provided with boxing gloves or other "fighting equipment."

48.     The Defendant Coaches would come into the locker room, force the players to participate in the "exercise," and, instead of stopping the fights and protecting the players, the Defendant Coaches would act as spectators watching the fights, egging it on, laughing, and occasionally placing wagers on the outcome.

49.     Mason was selected by Defendant Coaches to be the one "in the Ring" approximately 90% of the time.

50.     While in the Ring, Mason was frequently choked by other football players to the point of nearly passing out.

51.     Another player was forced to box in the Ring until he could no longer move, and yet another player was punched in the face so hard his eye swelled and turned black.

52.     On one occasion, Defendant Nall wrestled a sophomore player in the Ring.

53.     The Oklahoma Drill and the Wall Drill were put on the football practice schedule.

54.     Defendant Myers prepared the majority of the practice schedules; thus, it is evident not only that the Defendant Coaches knew the abusive drills were occurring and

failed to stop them, but also that much of the abuse suffered by Mason was pre-scheduled and coach-sanctioned.

55.     On at least four different occasions during Mason's freshman year, upperclassman Offending Players tazed Mason, among others, with a Taser Stun Gun in the locker room. He was tazed in the buttocks, thigh, and shoulder. Each time, the other players present in the locker room laughed at Mason during and following the attacks.  An exemplar of the Taser Stun Gun is below.



56.     On later occasions, Offending Players purposely triggered the Taser Stun Gun without making physical contact with Mason and would laugh at and ridicule Mason when he would be startled by the distressing sound of the Taser Stun Gun and attempt to flee.

57.    Defendant Myers was aware of the incidents of abuse connected with the Taser Stun Gun, and acknowledged his awareness of these incidents to John Doe No 1's father. However, Defendant Myers administered no punishment or discipline to the Offending Players and made no report of the incidents to school administration.

58.    On multiple occasions, Offending Players fired a paintball gun at other players, including Mason, at close range within the locker room, leaving large welts on the victims, including Mason.

59.    The Defendant Coaches were aware that the guns were being shot in the locker room, and instead of stopping it, called the practice "breaking in freshmen."  The paintball gun was also utilized to fill Mason's new cleats with paint and ruin them.  An exemplar of the paintball gun is below.



60.    On one occasion during his sophomore year, Mason was one of the last people to exit the locker room building. As he exited, Mason noticed many of the players and the coaches were inexplicably standing around on the practice field and watching

Mason. As Mason made his way across the parking lot to get to the practice field, an upperclassman ambushed him, jumping out of the bed of a truck and firing innumerable shots from a paintball gun at Mason at close range, hitting him multiple times, mostly in the chest. Mason ran from the attacker, and after escaping to a safe distance, he turned around and saw that the players and Defendant Coaches were laughing at him.

61.     On more than one occasion, Offending Players fired a pellet gun rifle in the locker room. Many of the pellets, having ricocheted off the rubber locker room floors, struck Mason and other players. Often, an Offending Player pointed the gun directly at Mason's face and threatened to shoot him at point blank range, which such threats Mason understood to be credible after being tazed, flogged, beaten, shot with paintball guns, and otherwise abused. An exemplar of the pellet gun rifle is below.



62.     On two occasions, an upperclassman Offending Player left threatening audio messages, one of which included a death threat, for Mason and Mason's friend in a team

group chat on the Snapchat app. In a message directed at Mason, the Offending Player threatened:

> This is my last warning. Do not show up to practice tomorrow. Like I'm already gonna f*ck on you, but if you say anything else to try to f*ck on me and come at me, then I probably will beat your ass right there. Like you don't understand how f*cking annoying you are and how f*cking nobody likes you, because you're a f*cking little b*tch, just a rich spoiled ass who's got powerful parents that can sue whoever in the f*ck they want. Like you think you're all big and bad just 'cause you have f*cking rich parents.

In another message, directed at Mason's friend, the same Offending Player threatened:

> [Name of Player], after I get done legit kicking your ass and then taking a big ol' sh*t in your mouth, I'm gonna go and beat the absolute f*ck out of [Mason]. Like he thinks I'm kidding, but I'm gonna beat his ass, and if he f*cking dares tells his mom, I'm gonna f*cking go and kill that b*tch.

63.    In 2018, Mason was forcibly restrained by at least two Offending Players, while a third Offending Player sexually assaulted him by placing his naked anus on Mason's nose and the aggressor's scrotum on Mason's face. For some time following the sexual assault and act of sexual violence, Mason was ridiculed and humiliated by other players on the Football Team, some of whom had witnessed the attack. When players would see Mason, they would make a circle with their thumb and pointer finger and put it around their nose, mimicking the assault endured by Mason.

64.    The Defendant Coaches knew of the sexual assault, because the next day at practice Defendant Myers held a team meeting during which he talked to the players about the assault on Mason and advised them of an incident where a football player at another school was recently sodomized with a broomstick and the team wasn't allowed to play

20

football following the incident. The discussion was not about the fact that Mason had been victimized but that the team could get in trouble if anyone outside of the Football Team and the School Administration found out.

65.     In addition to the assault upon Mason, multiple other sexual assaults were perpetrated upon other football players between 2008 (if not earlier) and continuing through 2021. At least one of the players was assaulted by both Defendants Nall and Myers; Defendant Myers encouraged other players to similarly assault the victim.

66.     Multiple players on the Football Team during the relevant time witnessed the Defendant Coaches and/or Offending Players abuse, haze, and bully Mason.

67.     Mason Mecklenburg is not the only player to experience persistent hazing and abuse, but he is widely recognized by other players on the Football Team as the player who experienced the most extreme abuse.

68.     The bullying was so conspicuous and frequent that the Defendant Coaches had in fact sanctioned the bullying as part of the Kingfisher Football Team's accepted culture and custom.

69.     One former player reported that there was "an understanding on the team that people could abuse Mason and get away with it. The coaches never did anything to stop the abuse."

70.     Mason Mecklenburg suffered extreme physical and emotional harm as a result of the abuse. Mason cried every single day after the daily abuse had been administered. As a result of the abuse, Mason became withdrawn, quiet, stayed in his room, and refused to go out in public, all behaviors which were contrary to his disposition prior

to the abuse. His parents closely monitored him and refused to leave him home alone for any meaningful amount of time out of fear that he may attempt suicide.

71.     Mason's father met with Defendant Myers in person or via telephone on several  separate occasions during Mason's sophomore, junior, and senior years to express concerns about the bullying, hazing, and abuse. Defendant Myers admitted knowledge of the offenses committed against Mason but continued to fail to take any action whatsoever, allowed the bullying, hazing, and abuse to continue, and in fact himself continued to commit abuses against Mason.

72.     Mason's father met with the superintendent and principal/athletic director and three school board members of Kingfisher Public Schools to no avail. During a second meeting, the superintendent told Mason's father that he did not have time to investigate the allegations and said "if you want the truth to come out, you're going to have to sue us." Indeed, no investigation was conducted; school officials never even asked Mason or any other players on the Football Team about the abuse.

73.     A current player on the Football Team reports being hit with a PVC pipe called the "rape stick," being headbutted, pinched, pushed, tripped, and hit. The coaches watch the upperclassmen commit these abuses but do nothing to stop them.  The abuse of players on the Football Team has continued unabated.

74.     Some Offending Players who were on the Football Team were also members of the basketball and/or baseball teams. Unlike in football practice where these players were encouraged to haze, bully, and abuse their teammates, while in basketball and/or

baseball practice, these same players did not haze, bully, or abuse other members of the basketball and/or baseball teams.

75.    The abuse is ongoing; children continue to be victimized. Since 2008, the earliest-discovered instance of abuse, the players on the Football Team have changed, the administration of Kingfisher Public Schools has changed, the assistant coaches on the Football Team have changed. The abuses suffered by players on the Football Team, and of course, the head coach, Defendant Myers, are the only two things that have remained constant in the last thirteen years. Defendants Nall, Patterson, and Eaton did not only accommodate the abuse, they actively participated in and encouraged it. The Defendant Coaches, with the tacit approval of Kingfisher Public Schools, have created and encouraged a culture rife with abuse within the Football Team.

**PART FOUR - CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**
**42 U.S.C. § 1983**
**Against Defendant Kingfisher Public Schools, only**

76.    COMES NOW the Plaintiff, Mason Mecklenburg, and hereby adopts and includes the foregoing statements and allegations as if they were fully stated herein, and for his First Cause of Action against Kingfisher Public Schools, alleges and states that under the Fifth Amendment and the Fourteenth Amendment, Plaintiff has the right to Due Process and Equal Protection of the Law, rights which were denied him by Defendant Kingfisher Public Schools.

77.    Mason asserts this cause of action against Defendant Kingfisher Public Schools only.

78.     At all times relevant hereto, it was clearly established that Plaintiff  had fundamental rights to physical safety and to be free from the infliction of unnecessary pain.

79.     It is and was at all relevant times clearly established law in the Tenth Circuit that public officials acting under color of law and school districts "can be liable for the acts of third parties where those officials 'created the danger' that caused the harm." *Seamons v. Snow*, 84 F.3d 1226, 1236 (10th Cir. 1996).

80.     The Fourteenth Amendment to the United States Constitution provides in part that no State shall "deprive any person of life, liberty, or property, without due process of law" and that no State shall "deny any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV.

81.     Kingfisher Public Schools is a state actor acting under the color of state law.

82.     Kingfisher Public Schools denied Plaintiff his rights to Due Process and Equal Protection of the Law by:

    a.  enacting and implementing inadequate policies concerning bullying, misconduct, and abuse;

    b.  allowing Myers, Nall, Patterson, and Eaton to continue coaching and failing to remove Myers, Nall, Patterson, and Eaton from the coaching staff in a timely manner or at all;

    c.  allowing male football players to be alone with those who had been tasked with inflicting pain;

    d.  improperly investigating the football bullying, before and after these referenced allegations;

24

    e.   improperly hiring, training, and supervising Myers, Nall, Patterson, and Eaton;

    f.   continuing to employ Myers, Nall, Patterson, and Eaton;

    g.   improperly and/or inadequately training and supervising its other employees; and

    h.   exhibiting deliberate indifference to the misconduct directed at Plaintiff and others like him.

83.    Kingfisher Public Schools has an unconstitutional custom or policy of:

    a.   improperly and/or utterly failing to report criminal misconduct;

    b.   improperly and/or utterly failing to investigate criminal misconduct;

    c.   discounting the credibility of the allegations; and

    d.   inadequately training and supervising employees with regard to the investigation and reporting of abuse of its male football members.

84.    The policy is attributable to a policymaker.

85.    The resulting inadequate policies and resulting failures allowed the bullying and misconduct to occur, resulting in the violation of Plaintiff's Fifth Amendment rights and Plaintiff's Fourteenth Amendment rights to Due Process and Equal Protection.

86.    Bullying of male student athletes at a school is a danger.

87.    An environment where male student athletes are feloniously touched, molested, and/or beaten is a dangerous environment.

88.    Kingfisher Public Schools created a dangerous environment for the members of the Football Team, including Plaintiff.

89.     Kingfisher Public Schools, as a state actor, affirmatively acted to create, or increased the Plaintiff's vulnerability to or danger from, the misconduct of others.

90.     Plaintiff was a member of a limited and specifically definable group—namely, male, football player, and student.

91.     Kingfisher Public Schools created the danger or increased the Plaintiff's vulnerability to the danger by ignoring the allegations of Plaintiff, Plaintiff's father, and others and not immediately ending the bullying practice within the Football Team.

92.     Kingfisher Public Schools' conduct put Plaintiff at a substantial risk of serious, immediate and proximate harm. That risk included being abused while at Kingfisher Public Schools. Indeed, Mason Mecklenburg was abused after Kingfisher Public Schools had actual notice of bullying misconduct.

93.     The risk of danger was obvious or known to Kingfisher Public Schools.

94.     Kingfisher Public Schools' actions and inactions created an opportunity for the bullying practice, the bullying culture and the bullying misconduct to continue unabated.

95.     Kingfisher Public Schools acted recklessly in conscious disregard of that risk.

96.     Kingfisher Public Schools' conduct, when viewed in total, shocks the conscience.

97.     WHEREFORE Plaintiff Mason Mecklenburg prays for judgment against Defendant Kingfisher Public Schools as follows:

a. for his actual damages in a sum in excess of the amount required for diversity jurisdiction under 28 United States Code § 1332;

b. for equitable relief prohibiting Defendant Kingfisher Public Schools and/or any of its employees or agents from retaliating against any of the witnesses revealed herein;

c. for a reasonable attorney's fee;

d. for court costs;

e. for pre-judgment and post-judgment interest as allowed by law; and

f. for any other such and further relief as the Court or jury deems just and equitable that is allowed by law and justified by the factual record.

**SECOND CAUSE OF ACTION**
**Violation of Title IX**
**Against Defendant Kingfisher Public Schools, only**

98.     Plaintiff incorporates by reference the above and foregoing paragraphs as though set forth in full herein.

99.     Mason Mecklenburg asserts this cause of action against Defendant Kingfisher Public Schools only.

100.    Title IX of the Education Amendments Act of 1972 ("Title IX") provides that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a).

101.   Defendant Kingfisher Public Schools is an educational institution that receives Federal financial assistance. Therefore, Defendant Kingfisher Public Schools has an obligation to comply with the terms and provisions of Title IX.

102.   Sexual harassment and/or sexual abuse of a student is a form of discrimination on the basis of sex and is an actionable claim under Title IX. *Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60, 75 (1992).

103.   Plaintiff suffered sexual harassment and/or abuse; therefore, the discrimination was on the basis of sex. In addition, the discrimination was on the basis of sex, because only males endured the abuse. No female students were subjected to the abuses suffered by Plaintiff or the other male victims.

104.   Defendant Kingfisher Public Schools was deliberately indifferent to acts of abuse, harassment, or discrimination as set forth herein.

105.   Defendant Kingfisher Public Schools' employees had actual knowledge of the abuse, harassment, or discrimination, as set forth herein.

106.   The employees who had actual knowledge had the authority to take corrective action to end the unlawful conduct yet did not do so.

107.   The abuse, harassment, and/or discrimination suffered by Mason was so severe, pervasive and objectively offensive that he was excluded from participation in, denied the benefits of, and/or subjected to discrimination in the educational program provided by the school.

108.   Plaintiff's exclusion from participation, denial of benefits, and/or discrimination was on the basis of sex.

109.    As a direct and proximate result of Defendant Kingfisher Public Schools' violations of Title IX, Mason Mecklenburg endured physical pain and suffering, mental anguish and emotional distress, sleeplessness, anxiety, humiliation, embarrassment, inconvenience, loss of enjoyment of life, and other nonpecuniary losses, all to his detriment.

110.    WHEREFORE Plaintiff Mason Mecklenburg prays for judgment against Defendant Kingfisher Public Schools as follows:

    a.   for his actual damages in a sum in excess of the amount required for diversity jurisdiction under 28 United States Code § 1332;

    b.   for equitable relief prohibiting Defendant Kingfisher Public Schools and/or any of its employees or agents from retaliating against any of the witnesses revealed herein;

    c.   for a reasonable attorney's fee;

    d.   for court costs;

    e.   for pre-judgment and post-judgment interest as allowed by law; and

    f.   for any other such and further relief as the Court or jury deems just and equitable that is allowed by law and justified by the factual record.

**THIRD CAUSE OF ACTION**
**Gross Negligence under Oklahoma Common Law**
**Against Defendants Myers, Nall, Patterson, and Eaton, only**

111.    Plaintiff incorporates by reference the above and foregoing paragraphs as though set forth in full herein.

112.    Mason Mecklenburg asserts this cause of action against Defendants Myers, Nall, Patterson, and Eaton only.

113.    The Defendant Coaches owed the Plaintiff a legal duty to provide an educational environment free from abuse, assault, bullying, and harassment. *See Wofford v. E. State Hosp.*, 1990 OK 77, ¶ 10, 795 P.2d 516, 519 ("Whenever a person is placed in such a position with regard to another that it is obvious that if he did not use due care in his own conduct he will cause injury to the other, the duty at once arises to exercise care commensurate with the situation in order to avoid such injury" (quoting *Union Bank of Tucson v. Griffin*, 1989 OK 47, ¶ 13, 771 P.2d 219, 222)).

114.    The Defendant Coaches breached their duty to the Plaintiff, because they each failed to provide Plaintiff with a safe educational environment free from abuse, assault, bullying, and harassment, instead encouraging and enabling said abuse, assault, bullying and harassment.

115.    The Defendant Coaches' actions were grossly negligent and outside the course and scope of their employment.

116.    The Defendant Coaches' actions were taken in reckless disregard of the consequences and with callous indifference to Plaintiff's rights and as such Plaintiff is entitled to punitive and exemplary damages against these Defendants.

117.    As a direct and proximate result of the Defendant Coaches' gross negligence, Mason Mecklenburg has endured physical pain and suffering, mental anguish and emotional distress, sleeplessness, anxiety, humiliation, embarrassment, inconvenience, loss of enjoyment of life, and other nonpecuniary losses, all to his detriment.

118.    WHEREFORE Plaintiff Mason Mecklenburg prays for judgment against Defendants Myers, Nall, Patterson, and Eaton as follows:

    a.  for his actual damages in a sum in excess of the amount required for diversity jurisdiction under 28 United States Code § 1332;

    b.  for punitive and exemplary damages in an amount to be determined by the jury at the time of trial;

    c.  for a reasonable attorney's fee;

    d.  for court costs;

    e.  for pre-judgment and post-judgment interest as allowed by law; and

    f.  for any other such and further relief as the Court or jury deems just and equitable that is allowed by law and justified by the factual record.

### FOURTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress under Oklahoma Common Law
### Against Defendants Myers, Nall, Patterson, and Eaton, only

119.    Plaintiff incorporates by reference the above and foregoing paragraphs as though set forth in full herein.

120.    Mason Mecklenburg asserts this cause of action against Defendants Myers, Nall, Patterson, and Eaton only.

121.    The physical and mental abuse that was inflicted upon Plaintiff, Mason, was done maliciously and sadistically.

122.    The Defendant Coaches' actions were extreme, outrageous, and beyond the bounds of decency.

123.    The actions of the Defendant Coaches were atrocious and utterly intolerable in a civilized society.

124.    As a direct result of the action of the Defendant Coaches, Plaintiff was severely traumatized and suffered severe emotional distress beyond which a reasonable student athlete could be expected to endure.

125.    The Defendant Coaches intentionally and/or recklessly caused Plaintiff's emotional distress, knowing that such distress was substantially certain to result from their conduct.

126.    The actions of the Defendant Coaches were intentional and/or with reckless disregard for the rights of others, including the rights of Plaintiff.

127.    Plaintiff, Mason Mecklenburg, is entitled to recover punitive damages against the Defendant Coaches to deter them, and others similarly situated, from this behavior in the future and to punish them for their socially unacceptable behavior.

128.    WHEREFORE Plaintiff Mason Mecklenburg prays for judgment against Defendants Myers, Nall, Patterson, and Eaton as follows:

> a.  for his actual damages in a sum in excess of the amount required for diversity jurisdiction under 28 United States Code § 1332;
>
> b.  for punitive and exemplary damages in an amount to be determined by the jury at the time of trial;
>
> c.  for a reasonable attorney's fee;
>
> d.  for court costs;
>
> e.  for pre-judgment and post-judgment interest as allowed by law; and

    f.  for any other such and further relief as the Court or jury deems just and

equitable that is allowed by law and justified by the factual record.

**FIFTH CAUSE OF ACTION**
**42 U.S.C. § 1983**
**Against Defendants Myers, Nall, Patterson, and Eaton, only**

129.    Plaintiff incorporates by reference the above and foregoing paragraphs as though set forth in full herein.

130.    Mason Mecklenburg asserts this cause of action against Defendants Myers, Nall, Patterson, and Eaton only.

131.    The Fourteenth Amendment to the United States Constitution provides in part that no State shall "deprive any person of life, liberty, or property, without due process of law" and that no State shall "deny any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV.

132.    At all times relevant hereto, it was clearly established that Plaintiff had fundamental rights to physical safety and to be free from the infliction of unnecessary pain.

133.    It is and was at all relevant times clearly established law in the Tenth Circuit that public officials acting under color of law and school districts "can be liable for the acts of third parties where those officials 'created the danger' that caused the harm." *Seamons v. Snow*, 84 F.3d 1226, 1236 (10th Cir. 1996).

134.    The Defendant Coaches acted under color of law at all relevant times.

135.    The resulting inadequate policies and resulting failures allowed the bullying and misconduct to occur, resulting in the violation of Plaintiff's Fifth Amendment rights and Plaintiff's Fourteenth Amendment rights to Due Process and Equal Protection.

33

136.    Bullying of male student athletes at a school is a danger.

137.    Plaintiff was subjected to a severe or pervasive hostile educational environment that interfered unreasonably with his school performance and created a hostile or abusive educational environment.

138.    The Defendant Coaches, as state actors, affirmatively created the danger or increased Plaintiff's vulnerability to danger, through the Defendant Coaches' encouragement of and deliberate indifference to bullying and abuse by others as well as their own occasional participation in and scheduling of said abuse.

139.    The Defendant Coaches further created the danger or increased the Plaintiff's vulnerability to the danger by ignoring the allegations of Plaintiff, Plaintiff's father, and others and not immediately ending the bullying practice within the Football Team.

140.    Plaintiff was a member of a limited and specifically definable group—namely, male, football player, and student.

141.    The Defendant Coaches' conduct put Plaintiff at substantial risk of serious, immediate, and proximate harm.

142.    This risk of serious, immediate, and proximate harm was obvious and/or known by each of the Defendant Coaches identified in this Count.

143.    The Defendant Coaches' actions and inactions created an opportunity for the bullying practice, the bullying culture and the bullying misconduct to continue unabated.

144.    The Defendant Coaches acted recklessly with a conscious disregard of that risk.

145. The Defendant Coaches' conduct, when viewed in total, is conscience shocking.

146. WHEREFORE Plaintiff Mason Mecklenburg prays for judgment against Defendants Myers, Nall, Patterson, and Eaton as follows:

    a. for his actual damages in a sum in excess of the amount required for diversity jurisdiction under 28 United States Code § 1332;

    b. for punitive and exemplary damages in an amount to be determined by the jury at the time of trial;

    c. for a reasonable attorney's fee;

    d. for court costs;

    e. for pre-judgment and post-judgment interest as allowed by law; and

    f. for any other such and further relief as the Court or jury deems just and equitable that is allowed by law and justified by the factual record.

Respectfully submitted,

*/s/ Ross Leonoudakis*
Bradley E. Beckworth
Ross Leonoudakis
Nathan Hall
NIX PATTERSON, LLP
8701 Bee Cave Road
Bldg. 1. Suite 500 Austin, TX 78746
(512) 328-5333 telephone
(512) 328-5335 facsimile
bbeckworth@nixlaw.com
rossl@nixlaw.com
nhall@nixlaw.com

CAMERON SPRADLING, OBA No. 8509
500 North Walker Avenue, Suite 100
Oklahoma City, Oklahoma 73102
Phone: (405) 605-0610
Fax: (405) 605-0615
cameron@cameronspradling.com

***Attorneys for Plaintiff***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 17, 2023, a true, correct and exact copy of the foregoing document was sent via email to the following counsel of record:

John E. Priddy
Emily C. Krukowski
Eric D. Janzen
ROSENSTEIN, FIST & RINGOLD
525 South Main, Suite 700
Tulsa, OK  74103
Telephone: (918) 585-9211
Facsimile: (918) 583-5617
johnp@rfrlaw.com
ekrukowski@rfrlaw.com
ejanzen@rfrlaw.com
***Attorneys for Defendants School District, Derek Patterson, and Blake Eaton***

Joe E. White, Jr.
Kate C. White
Matthew P. Cyran
WHITE & WEDDLE
630 N.E. 63rd Street
Oklahoma City, OK  74105
Telephone: (405) 858-8899
joe@whiteandweddle.com
kate@whiteandweddle.com
matt@whiteandweddle.com
***Attorneys for Defendant, Jeff Myers***

Mark S. Rains
ROSENSTEIN, FIST & RINGOLD
525 South Main, Suite 700
Tulsa, OK  74103
Telephone: (918) 585-9211
Facsimile: (918) 583-5617
mrains@rfrlaw.com
***Attorney for Defendant, Micah Nall***

*/s/ Ross Leonoudakis*
Ross Leonoudakis